THE PEOPLE ex rel. FRANCIS C. BARLOW, Attorney-General, Appellants, *v.* WILLIAM E. CURTIS, Respondent.

By the Constitution of the United States the whole subject of foreign intercourse is committed to the federal government, and upon all questions relating thereto it alone can speak and act. It has the exclusive power to regulate, provide for and control the surrender of fugitives from justice from foreign countries. The provision, therefore, of the Revised Statutes (1 R. S., 164, §§ 8–11) providing for such surrender is unconstitutional, and a warrant issued by the governor in pursuance thereof is void.

(Argued November 11, 1872; decided November 19, 1872.)

ERROR to the General Term of the Supreme Court in the first judicial department, to review judgment affirming proceedings upon *habeas corpus* of defendant, a justice of the Supreme Court of the city and county of New York, which

proceedings were brought into the Supreme Court by writ of certiorari. (Reported below, 46 How. Pr. R., 171.)

Carl Vogt, on the 25th day of May, 1872, was in custody of the warden of the city prison of the city of New York upon a commitment to answer an indictment for grand larceny.

Upon the request of the minister of the kingdom of Belgium, who charged that Vogt had been guilty of the crimes of murder, robbery and arson, near Brussels, the governor of this State, upon the day last named, issued his warrant, under the provisions of the law of 1822 (1 R. S., 164, § 8), to the sheriff of the county of New York, reciting the fact that the proof required by the act of 1822 had been produced before him, which proof was set forth in detail, and further reciting the application of the Belgian minister, and directing the sheriff to deliver Vogt to the person designated by the Belgian authorities, to the end that he might be taken to Brussels to be tried for his crimes.

Upon a hearing upon a *habeas corpus,* issued upon the petition of Vogt, brought to inquire into the legality of his detention, defendant discharged Vogt upon the governor's warrant and recommitted him upon the commitment for grand larceny, upon which latter writ he now remains in custody.

It was conceded that there is no extradition treaty between the United States and Belgium.

The discharge was upon the ground that the act of 1822 and the warrant of the governor thereunder are in conflict with the Constitution of the United States, and therefore void.

*Francis C. Barlow,* attorney-general, for the people. The State of New York has not, in this case, entered into a compact or agreement with a foreign power. (*Holmes* v. *Jennison,* 14 Peters, 540, 571, 572; *Green* v. *Biddle,* 8 Wheat., 92; Duer Treatise on Const. Law, 385.) The States may exercise certain powers until congress has occupied the ground by legislation. (*Sturges* v. *Crowninshield,* 4 Wheat., 122,

195, 196; *Wilson* v. *Black Bird Creek Co.*, 2 Pet., 245; *Houston* v. *Moore*, 5 Wheat., 1–21, 51, 52.)   A State has the power to forbid the entrance and to remove from its territory persons considered dangerous.   (*City of New York* v. *Miln*, 11 Pet., 102; *Holmes* v. *Jennison*, 14 id., appendix, 616, 618; *Ex parte Holmes*, 12 Vt., 643; *Prigg* v. *Pennsylvania*, 16 Pet., 539, 625; *Moore* v. *Illinois*, 14 How., 13, 18; *In re Washburn*, 4 Johns. Ch., 106.)

*William F. Kintzing* for the respondent.   The attempt of the State to deliver up defendant was unconstitutional and in derogation of the rights of the general government.   (1 Am. State Papers, 175; vol. 2 Opinions Attorneys-General, 452, 559; Wheaton's Elements, 171; vol. 6 Opinions Attorneys-General, 85, 432; Wheaton's Int. Law, by Dana, 181; 10 Sergt. & Rawle, 134; *Ex parte Holmes*, 12 Vt., 636; Story on Const., § 1355; *Gibbons* v. *Ogden*, 9 Wheat., 1; Federalist, No. 22; *Holmes* v. *Jennison*, 14 Pet., 572, 573.)   The statute and warrant of the governor are in violation of the Constitution of this State.   (State Const., art. 1, §§ 2, 6; 1 Black. Com., 135–137; *Taylor* v. *Porter*, 4 Hill, 140; *People ex rel. Baldwin* v. *Haws*, 15 Abb., 119; *Wynehamer* v. *The People*, 13 N. Y., 378; *Commonwealth* v. *Green*, 17 Mass., 534.)      .

CHURCH, Ch. J.   This is a writ of error to review a judgment of the General Term of the Supreme Court in the first judicial department, rendered upon a certiorari, removing into that court certain proceedings had before the respondent, as a justice of the Superior Court of the city of New York, on *habeas corpus*, in the case of Carl Vogt.

The return showed that the prisoner was in custody of the warden of the city prison, upon a commitment by a police justice for grand larceny; and, also, that the sheriff of the city and county of New York was present with a warrant, issued by the governor of the State of New York, for the apprehension and delivery to the authorities of the kingdom

of Belgium of the said Carl Vogt; and the sheriff prayed for an order adjudging that the prisoner be awarded to him.

The warrant of the governor was issued under and in pursuance of a statute of this State, passed in 1822 (1 R. S., 468, 5th ed.), providing for the surrender of fugitives from justice from foreign countries. The question involved is whether this statute is a violation of the Constitution of the United States. The statute provides that the governor may, in his discretion, deliver over to justice any person found within the State who shall be charged with having committed, without the jurisdiction of the United States, any crime, except treason, which, by the laws of this State, if committed therein, is punishable by death, or by imprisonment in State prison. Such delivery can only be made on the requisition of the duly authorized ministers or officers of the government where the crime was committed. The evidence required is such only as would justify the commitment of the accused for trial if the crime had been committed in this State.

The terms of this act are plainly indicative of an assumption of the right to regulate, provide for, and control the surrender of fugitives from justice from foreign countries; and the question presented is whether this is a power reserved to the States, or one which has been conferred upon the federal government, and, if conferred, whether the power is of that nature that it may be exercised by the States concurrently with the general government.

These questions of conflicting claims between the federal and State governments should always be carefully considered, and courts should be astute in settling them according to the true character of the respective governments, and sedulously guard and preserve the rights and powers of each. The highest interests of the States are promoted by yielding to the general government and protecting it in the enjoyment of unquestioned control over the subjects confided to it by the Constitution; while, on the other hand, the right of the States, in the free and absolute exercise of the great mass of reserved powers, should be left unmolested by the general

government. If this rule is carefully observed collisions will be avoided and the government perpetuated, while its violation tends to confusion, conflict and destruction.

It is not material to the determination of this question whether the practice of delivering up criminals is a duty imposed by the laws of nations, or exists only by comity. Writers upon public law differ, and the adjudications are somewhat conflicting; but the weight of modern authority is that it is not a duty which may be demanded, but a favor which may or may not be granted without furnishing cause for complaint; and that our own government so regard it, we have the authority of Jefferson, Monroe and Clay, when respectively holding the office of secretary of state. (American State Papers.)

This subject was so fully and elaborately considered by the Supreme Court of the United States in *Holmes* v. *Jamison* (14 Peters, 540) that an extended discussion is unnecessary, if not inappropriate.

First, I think we should regard that case as an authoritative decision against the constitutionality of the act in question. Although the appeal was dismissed, yet the opinion of Chief Justice TANEY upon the merits in favor of the discharge of the prisoner was concurred in by three of his associates, STORY, MCLEAN and WAYNE, and, as to the merits, substantially by two others; although the latter agreed to a dismissal of the appeal upon other grounds.

The decision was regarded as binding upon the return of the case by the Supreme Court of Vermont, and the prisoner was discharged. (12 Vt., 631.) I am not aware of any adjudication since that time impairing the effect of this decision; and as the subject is one within the cognizance of the federal courts, the question should be regarded as settled. This is a much stronger case for holding the act of the governor invalid than the Vermont case. There the State had not acted at all. The act of the governor in issuing his warrant was not authorized by law, nor did it appear that any demand had been made by the Canadian government for the rendition of

326    The People ex rel. Barlow *v.* Curtis.    [Nov.,

Opinion of the Court, per Church, Ch. J.

the prisoner; and one of the judges agreed to a dismissal of the appeal upon the latter ground. Here the State has made a permanent regulation for the delivery of fugitives, and the record shows that a formal demand was made upon the governor according to the terms of the statute. If the same facts had appeared in that case, a judgment discharging the prisoner would have been rendered.

In the next place, the elaborate and exhaustive opinion of Chief Justice Taney commends itself to our judgment as a correct exposition of the law on the subject, and it would be difficult to add anything to the force of his reasoning. It is admitted by the attorney-general that the general government possesses the power over the subject of extradition of fugitives from justice, and that if it had exercised the power in regard to Belgium it would be exclusive, and that no one could be delivered except through the federal machinery; but he insists that this power is dormant as to all countries with which the government have made no treaty; that the States are not prohibited from exercising it, and that such exercise is not repugnant or inconsistent with the power conferred on the government. This position is not tenable. It is true that a grant of power to the general government does not necessarily operate as a prohibition of the same power by the States. (*Sturges* v. *Crowninshield*, 4 Wheat., 122.) There are subjects over which the general government and the States may exercise concurrent authority. If the terms of the grant are not exclusive, and there is no express prohibition upon the States, and no repugnancy or inconsistency in its exercise by the States, the authority is concurrent.

This subject is not one of that character. The whole subject of foreign intercourse is committed to the federal government. Indeed, this was one of the principal purposes of the Union. As to foreign countries, the States, as such, are unknown. The treaty-making power is exclusive in the general government not only, but the States are prohibited from exercising it in express terms. So the appointment of ambassadors and receiving ambassadors from foreign coun-

tries are confided to the Union, and the States are prohibited from making any compact or agreement with any foreign power. The act of the legislature under consideration authorizes foreign ministers and officers of foreign governments to make a demand upon the governor, and empowers him to treat with these ministers, and accede, in his discretion, to their demand. It is patent that the exercise of such a power by the States may frustrate the foreign policy of the government both as to countries with which the government has made a definite treaty, and as to those with which it has not.

It has been the policy of the government in later years to enter into extradition treaties with foreign nations; but the propriety of doing so in any particular case may depend upon a variety of circumstances known only to the officers of the government. We cannot determine nor judicially know but that the government, for reasons of public policy connected with its negotiations, may have declined to enter into such a treaty with Belgium, the demanding country, or that country may have itself refused to make such a treaty without some undue stipulations on our part. Is it to be tolerated that a State may overrule the decision of the government, and thus embarrass its foreign negotiations, and, for that purpose, may the States receive and treat with foreign ministers?

If one State may, all the States may make these arrangements, which arrangements may all differ from each other; and the same States may make different arrangements with each foreign nation. The embarrassment which such an exercise of power by the States would produce to the general government in its foreign policy is obvious. The general government might adopt the policy of refusing to make an extradition treaty with all nations, or it might refuse as to Belgium or any other particular country. It cannot be said, from the absence of a treaty with any country or all countries, that the power is dormant. It may be as much exercised by refusing as by making a treaty. In the absence of a treaty we are to presume a refusal or failure to make one on the part of the government. In either case the power is not dormant.

The nature of the power is such that it cannot be dormant. It is necessarily in active exercise by the government when acting or omitting to act. The dormant powers are such as the States may exercise over their internal affairs without colliding with the action or non-action of the general government. Such is the subject of bankruptcy. If the general government omits, as it may, to pass uniform laws relating to bankruptcies, it is competent for the States to enact laws on that subject. An omission by the government to act can be regarded in no sense as a decision that such laws should not be enacted by the States, and the action of the States contravenes no policy of the government. So of taxation, except where there is a prohibition on the States. So when the general government leaves the regulation of commerce, the States may take it up within their respective jurisdictions; and there are other powers which are concurrent until a collision occurs, and then the government is supreme. (11 Pet., 102; 5 Wheat., 1; 12 id., 213.) But the dormant powers, as they are called, are those which may be exercised for the protection of the States within their territories, and relate to their internal affairs. As to foreign intercourse, and all questions relating thereto, the government alone can speak and act, and the power is therefore necessarily exclusive.

The difficulty in executing the power by the governor, and of determining the proper occasion of delivering up fugitives, serves also to illustrate the impropriety of State action and the repugnance of the power. The governor is authorized to deliver the fugitive "in his discretion." This is a delicate duty, and one which may lead to complications and ill-feeling with the country making the demand, and thus involve the general government in difficulty and possibly in war, which was one of the evils intended to be guarded against by giving to the Union the exclusive power over foreign affairs. The governor has power by the act to deliver up fugitives for all crimes punishable in this State by death, or States prison, except treason. This involves the power to determine when a case comes without the exception. There may be cases

where the real crime is treason, but the charge of other crimes is preferred and perhaps established for the purpose of securing a surrender of the accused. When beyond our territory the State is powerless to retake him, or obtain redress for the fraud and imposition, while the general government possesses ample power of redress. Again, it being conceded that extradition is included within the treaty-making power, if the States may regulate it, why may they not regulate any other question included in that power? Although expressly prohibited from entering into a treaty, the regulation of the proper subjects of it, is a practical exercise of the power, which renders the prohibition nugatory. In any view of the question the repugnance is clear. I think also that the express prohibition against making an agreement with a foreign power is violated by the act of the legislature.

The object of this provision was to prevent all official intercourse with foreign nations. By this act the foreign minister demands of the governor the surrender. The governor consents to deliver and does it. Is this not an agreement within the mischief which the Constitution was designed to prevent? If the State may make an agreement to deliver one fugitive upon a specific demand, why may it not make a general arrangement with a foreign power for all fugitives, and if it may bargain to deliver, why not for the surrender of its fugitives? Under this act, upon a demand, why may not the governor consent to surrender the fugitive upon condition that the foreign power will surrender a fugitive from this State?

The learned attorney-general says: " If I take a penny to give a beggar and subsequently change my mind, and put it back in my pocket, have I violated my contract? and from this he argues that there is no agreement under this act, because the governor may at any time before the actual surrender " at his discretion " refuse to surrender.

It does not establish that no agreement has been made to prove that there was a time when either one or both of the parties might have repented and recanted. It is unnecessary to determine that the governor might not, even after the sur-

render and before the fugitive leaves the State, revoke the warrant and discharge the prisoner. Under this act it is at least doubtful whether he could, and whether the power of the governor over the subject would not cease the moment the surrender was consummated by a delivery of the fugitive into the custody of the foreign power. But the character of the transaction is not changed if he could, and when the fugitive left the State the arrangement would certainly be completely executed, beyond the reach of recall, and it is not changed by the want of opportunity to violate it.

A promise to give a beggar a penny upon demand is an agreement in a general and moral, although not in a legal sense, because it cannot be enforced for want of consideration; and agreements of this character, by the States with foreign powers, imply intercourse and arrangement, which were designed to be prohibited as much as strictly legal contracts. Indeed, no contract can be enforced in courts of justice against a State. Moral duty is the only obligation which a State can incur, and if the term agreement in the Constitution does not mean such an obligation, it means nothing.

We should not, upon this question, apply the technical rules applicable to civil contracts which may be violated and enforced. We must give such a construction to the term agreement as will effectuate the objects intended to be promoted, and avoid the evils designed to be prevented. These agreements need not be in writing nor founded upon any legal consideration. Any arrangements in relation to public questions are included in the term, and are intended to be prohibited. I am of the opinion that the act of the legislature is within the evils intended to be prevented, and is a violation of the express prohibition of the Constitution of the United States against making agreements with foreign powers. It is also claimed by the attorney-general that this act may be upheld under the acknowledged police power of the State, to prevent the entrance into the State of dangerous persons, and to remove them when admitted. (*City of New York* v. *Miln*, 11 Peters, 102.)

Whatever police power the State may possess of the character alluded to for its own protection, it is a sufficient answer to this position that the State has exercised no such power. The surrender of fugitives provided for is upon the demand and for the benefit of foreign powers, and not for the safety of the State. The police power requires neither co-operation or intercourse with foreign nations, and has no bearing upon this question. Vogt is to be surrendered under the act upon the demand only of the authorized minister of the foreign power, and not because he is unworthy of our hospitality. The governor in issuing the warrant acted under the authority of the statute, and had no power to act otherwise. He did not and could not exercise the police power invoked in this case without law, and, as we have seen, the legislature has not exercised it, and it is therefore unnecessary to discuss what power the legislature possesses in that direction.

It is urged that Vogt is a great criminal, and ought to be punished. If he has been guilty of the offences laid to his charge, of murder, robbery and arson, justice to him and protection to the community, demand his conviction and punishment. But however much we may regret the result on this account, we are more than compensated by the reflection that the escape of a single felon from the punishment due to his crimes is an insignificant evil compared with the consequences which may flow from sanctioning a violation of the Constitution of the United States.

The judgment must be affirmed.

All concur, PECKHAM, J., concurring in result.

Judgment affirmed.