## IN THE MATTER OF JOHN W. McCARTHY.

### EXTRADITION FROM CALIFORNIA.

### FEBRUARY, 1886.

### JUDD, C. J.; McCULLY and PRESTON, JJ.

There can be no question of the right of the Government, independent of any treaty, to surrender a fugitive criminal upon the request of a foreign State.

Upon a requisition from the Governor of California for the surrender of a fugitive from justice, the Minister-Resident of the United States in this Kingdom requesting the intervention of this Government: held that the objection that the Governor of a State has no power, under United States laws, to make such a requisition, is not sustainable in this case.

The production of an indictment against the fugitive, found by a Grand Jury, charging the crime alleged, is a sufficient presumption of guilt.

Although it would have been more regular to forward the original bench warrant, a certified copy thereof, issued under the seal of the Court, held sufficient.

It being sufficiently proven that the respondent is a fugitive from justice, the Court grants extradition, notwithstanding that embezzlement, the crime of which he is charged, is not extraditable under provisions of any treaty.

### OPINION OF THE COURT, BY PRESTON, J.

On the 25th day of January last, an information was laid by the Attorney-General before the Chief Justice, alleging that John W. McCarthy was guilty of the crime of embezzlement, as

a public officer (Clerk of the Supreme Court of the State of California), and that the Grand Jury for the city and county of San Francisco had, on the 15th day of January, found a true bill of indictment in the Superior Court of said city and county against the said McCarthy for such crime, and that a warrant had been issued from the said Court for the apprehension of the said McCarthy, and that said McCarthy had left San Francisco, and was then residing in Honolulu, and that a requisition for the surrender of the said McCarthy, under the hand of the Governor of the State of California and the Great Seal of the State, had been sent to His Majesty's Government, and praying for an order from the Chief Justice for the arrest of the said McCarthy, in order that he might be delivered to the officer sent to receive him.

The Chief Justice thereupon caused a warrant to be issued, under which McCarthy was arrested and brought before His Honor, on the 26th.

The Attorney-General appeared on behalf of the prosecution.

Mr. Whiting appeared for the prisoner and pleaded to the jurisdiction on the grounds :

1. That the warrant issued sets forth no crime or accusation of crime

2. That the crime for which extradition is sought is "embezzlement," and that "embezzlement" committed in a foreign country, viz., the United States, is not an offense or crime for which the person can be extradited.

3. That the demand for extradition is made through the Governor of the State of California, and that there is no authority in law for said Governor to make such demand.

4. That the affidavit and complaint are made by the Attorney-General of this Kingdom, and the Attorney-General cannot properly or legally make such complaint or be complainant herein.

The Chief Justice overruled the pleas, and on February 1st the case came up for hearing and evidence was introduced. It consisted of

1. A request by George Stoneman, Governor of the State of California, attested by the Secretary of State of California, under the Great Seal of the State, dated the 16th of January, 1886, to "His Royal Highness the King of the Hawaiian Islands," for

the apprehension and delivery to one Joseph Bee, who is duly authorized to receive him, of one John W. McCarthy, who stands charged with the crime of embezzlement, committed within the county of San Francisco.

2. Copy of an Indictment in the Superior Court of the City and County of San Francisco, State of California, against the said John W. McCarthy, in which he is accused by the Grand Jury of the City and County of San Francisco, with the crime of embezzlement, in that he was, on or about the 28th day of February, 1885, the duly elected, qualified and acting Clerk of the Supreme Court of the State of California, and, by virtue of his trust as such officer, there came into his possession and control ($550) five hundred and fifty dollars of the property of the State of California, and which he, at the City and County of San Francisco, on the 28th of February, 1885, willfully, unlawfully, fraudulently and feloniously did appropriate to his own use, contrary to the due and lawful execution of his said trust, and contrary to the form, etc., of the statute, etc. This is signed by J. N. E. Wilson, District Attorney, endorsed a "True Bill" by E. M. Burns, Foreman of the Grand Jury, and certified by Jas. J. Flynn, the Clerk of the Superior Court, as having been presented in open Court by the Foreman of the Grand Jury, and filed as a record of said Court on the 15th of January, 1886.

3. Copy of a bench warrant issued on the indictment by order of the Court and attested by Jas. J. Flynn, the Clerk, dated the 15th of January, 1886, for the arrest, forthwith, of the said John W. McCarthy.

4. Original affidavit or return of William Broughton, a police officer of the City and County of San Francisco, that he received the annexed warrant for the arrest of John W. McCarthy and that he made diligent search for him, etc., and avers upon information and belief that he has fled from justice in the State of California, and has taken refuge in the Kingdom of Hawaii. This is sworn to before a Deputy Clerk of the Superior Court.

These three last papers, to wit, the indictment, bench warrant and affidavit of William Broughton, are certified to by Jas. J. Flynn, Clerk of said Superior Court, under the said seal of the said Court, as a full and complete exemplification of the papers

and proceedings in the case of *The People of the State of California vs. J. W. McCarthy.* The genuineness of this certificate and signature is attested by M. A. Edmonds, Presiding Judge of the Superior Court of the City and County of San Francisco, and this is in turn certified to and authenticated by Jas. J. Flynn, Clerk as aforesaid. The genuineness of the seals and of the signatures of Judge Edmonds and Jas. J. Flynn, the Clerk, were proved to the satisfaction of the Chief Justice by competent evidence. The testimony of Joseph Bee, a police office of the City and County of San Francisco, was taken, that he knew the John W. McCarthy, then in Court, to be John W. McCarthy, who was in February, 1885, Clerk of the Supreme Court of the State of California, and who is charged in the indictment with embezzlement of public funds. Evidence of the statutes of California as to the constitution and jurisdiction of the Superior Court of California, the functions of the Grand Jury, the nature of an indictment found by it, the nature of the crime of embezzlement, etc., was also given.

The Chief Justice rendered his decision (which is on file) on the 4th of February, and thereupon certified to His Majesty's Minister of Foreign Affairs, that

" The Chief Justice now finds that the above named John W. McCarthy is charged with the crime of embezzlement committed by him as a public officer of the State of California, and entrusted with the custody of public funds belonging to said State while such officer :

" That said crime constitutes a felony by the laws of said State of California and is a crime within the meaning of section 449 of the Civil Code of the Hawaiian Islands :

" That the evidence adduced on the hearing aforesaid is sufficient to sustain the charge made against the said John W. McCarthy, and that the said John W. McCarthy is a fugitive from justice."

On the receipt of this certificate the Minister of Foreign Affairs issued his warrant for the arrest and surrender of the accused.

The accused having been arrested, he applied to Mr. Justice Preston, in Chambers on the 5th inst., for a writ of *habeas corpus,*

which was granted, and on the same day the accused was produced before such Justice and his detention justified under the Minister's warrant. At the request of the parties, the Judge discharged the writ *pro forma* in order that an immediate appeal might be taken, and the accused was remanded in custody.

The appeal came on for hearing on the 6th inst., and was argued by Mr. Whiting for the appellant and the Attorney-General *contra*.

The following points were taken by counsel for the appellant:

"1. That the State of California is not a sovereign power, and, therefore, this Government cannot recognize its demand for petitioner's extradition.

2. Our treaty and intercourse is all with the United States, and no person can or should be delivered up to the officers of any of its component parts, unless the demand therefor be made by the Government of the United States at Washington.

3. The papers upon which the demand is made are in themselves insufficient to warrant a delivery upon a demand from Washington, and *a fortiori* from California, in this, that the paper purporting to be a bench warrant is not issued under the seal of the Superior Court of the City and County of San Francisco, and is, therefore, void there and everywhere.

4. That the crime of embezzlement is not one mentioned in the treaty, and, even if the demand were made by the Government of the United States, this Government should not give up petitioner because the maxim, *enumeratio unius est exclusio alterius*, applies to a treaty.

5. That there is no evidence to warrant his arrest and delivery under our law.

6. That there is no evidence that he is a fugitive from justice, and, therefore, he should not be delivered up, as only fugitives from justice can be so delivered.

7. That this Government can only deliver up petitioner to the properly authorized agent of the United States of America, and Joseph Bee, who is named in the warrant, has no authority whatever from that Government.

8. The Court on *habeas corpus* cannot enquire into the exercise

72

of executive discretion when the right of personal liberty is involved.

9. This Government is not observing a due respect to the United States when it treats one of the States in all respects as though it were a sovereign power.

10. From the warrant of arrest and the affidavit of the Attorney-General it appears that the crime alleged to have been committed by John W. McCarthy, for which he is sought to be extradited, is that of "embezzlement." That embezzlement committed in a foreign country, viz., the United States, is not an offence or crime for which John W. McCarthy can be extradited.

11. That the demand for extradition is made through the Governor of the State of California. That there is no authority in law for said Governor to make this demand."

The case was elaborately presented by the learned counsel, and the following authorities *inter alia* were cited in support of his contentions:

Bishop's Cr. L., Sec. 23, 196, 25; *U. S. vs. Lancaster*, 2 McLean, 431; *Cohen vs. Virginia*, 6 Wheat., 264; Spear on Extradition, pp. 5, 116, 117, 195, 196, 383, 51; Opinions of Atty. Genl., Vol. 7, p. 6, Vol. 6, pp. 91, 85, 431; *Holmes vs. Jennison*, 14 Peters, 540; *The People vs. Curtis*, 50 N. Y., 321; *Respublica vs. Longchamps*, 1 Dall. 120; *Re Wong Sow*, 3 Hawn., 503.

A treaty is a supreme law of the land.

*Foster vs. Nelson*, 2 Pet., 253; Wheat. Int. Law, 93, 94; *Short's Case*. 10 Serg. & R., 134; *In re Washburn*, 4 Johns. Ch. 106; Remarks of Taney, C. J., in *Rhode Island vs. Massachusetts*, 14 Peters, 458.

The Attorney General contended that the Hawaiian Government might, under the authority of section 449 of the Civil Code and by International Law, although not bound to do so, surrender the accused, notwithstanding "embezzlement" was not a crime included in the Treaty with the United States.

## BY THE COURT.

The first point we have to consider is, whether the Minister of Foreign Affairs has authority by law to issue his warrant to surrender the petitioner.

It is a disputed question among writers on international law as to how far a sovereign state is *obliged* to deliver up persons charged with the commission of crime in a foreign country. But it is nowhere held that the Government of a sovereign state may not, in its discretion, deliver up such fugitives from justice on requisition made by a friendly government.

If there be a treaty, of course the contracting states are bound to deliver up persons accused of the commission of crimes mentioned in the Treaty, but it does not, in our opinion, follow that states are precluded from surrendering persons accused of other crimes than those specified.

The Treaty between this Government and the United States was ratified in August, 1850, and by it the contracting powers mutually agreed to surrender, upon official requisition, to the authorities of each, "all persons who, being charged with the crime of murder, piracy, arson, robbery, forgery or the utterance of forged paper, committed within the jurisdiction of either, shall be found within the Territories of the other."

In the case of Anson Wing, the opinion of the Attorney-General (Cushing) was cited by counsel for petitioner. The Attorney-General says: "It is the settled politic doctrine of the United States that, independently of special compact, no State is bound to deliver up fugitives from justice of another State." "It is true, any State may, in its discretion, do this as a matter of international comity towards the foreign state, but all such discretion is of inconvenient exercise in a constitutional republic, organized as is the Federal Union," etc. And similar opinions have been given by other Attorneys-General of the United States, and there is no doubt that the practice of the Government of the United States and of Great Britain has, in general, been in accordance with the policy stated by Mr. Cushing.

But in the case of Arguelles, the Government of the United States did seize and surrender to the Spanish Government, with which there was no extradition treaty, the person accused of crime. It is true Mr. Spear (p. 16) says it was nothing but legal kidnapping, but the Government exercised its discretion.

But the case under consideration stands, as we think, on higher grounds than any previously mentioned.

The Legislature of this Kingdom, by one of its first laws, after the recognition of its independence and sovereign rights, adopted the principle that it is the duty of the State to surrender fugitives from justice. By Article IV, Section 1, of the second Act of Kamehameha III, "An Act to arrange the Executive Departments of the Hawaiian Islands," it is enacted:

"The Governors, upon receiving information from the Minister of the Interior, that any person, an alien, fleeing from the justice of a foreign country on account of crime committed therein, is lurking in their respective islands, evading justice, and that formal demand has been made for his surrender by the representatives of such foreign country, or in case no demand has been made, that a public proclamation has been issued against such fugitive, and a reward offered for his apprehension and surrender, shall have power, and it shall be their duty, to issue a warrant for his or her apprehension."

By a subsequent part of the same Act, relating to the office of the Minister of Foreign Relations, it is enacted:

"The Minister of Foreign Relations, upon information in writing from the Minister of the Interior, that an alien fugitive from justice has been arrested within the jurisdiction of this Kingdom, and is in custody of the Marshal, pursuant to Section 3, Article 4, Chapter 4 of the first part of this Act, shall give immediate notice of such arrest to the accredited representative of the nation to which said fugitive belonged, if there be one near this Government; and he shall, through such representative, tender such fugitive to the nation whose subject or citizen he is; claiming, at the same time, the costs and expenses incurred by his apprehension, removal, confinement and surrender."

The statute also provides that in case the accredited representative shall decline to accept the surrender, the fugitive may be expelled the Kingdom. The policy of the Government being to deny the right of asylum to criminals.

The Civil Code was compiled and became law in 1859, and by it the following clauses were substituted for those before set out:

"Sec. 449. The respective judges and magistrates of the Kingdom shall have authority upon complaint made under oath to issue a warrant for the apprehension of any person charged

with the commission of a crime, in any foreign country, that he may be brought before such judges or other magistrates respectively to the end that evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the Minister of Foreign Affairs, that he may issue a warrant for the surrender of such fugitive."

"Sec. 451. The warrant of the Minister of Foreign Affairs, directing the surrender of any fugitive from justice, shall be binding upon all officers of His Majesty's Government, in anywise having the custody of such fugitive."

"Sec. 452. Every fugitive from justice may be retained in prison after his surrender, until a suitable opportunity occurs for his removal, at the expense of the officer to whom he is surrendered."

So that, it appears to the Court, there can be no question as to the right of His Majesty's Government to surrender a fugitive criminal.

And indeed a very distinguished living statesman (P. S. Mancini) maintains that "the duty of surrendering such fugitives is founded in natural right as a debt due to justice, and consequently does not depend for its existence either on the fact of a treaty or on the condition of reciprocity." See American Law Review, November-December, 1885, p. 955.

The Legislature having, according to our view, provided for the surrender of such fugitives, and His Majesty's Government having exercised its discretion, by the Minister of Foreign Affairs issuing his warrant for the surrender of the petitioner, it is not within our province to review the exercise of such discretion, except so far that we must see there is a proper legal basis to sanction the act of the Minister, and this brings us to the consideration of the remainder of the points urged on behalf of the petitioner.

The requisition is made by the Governor of the State of California and it is contended he has no power to make such a requisition by the Laws and Constitution of the United States.

However this may be, and without binding the Court to decide

as we now do in any case which may hereafter come before it, we hold, in the case now before us, that the Minister Resident of the United States having requested the intervention of His Majesty's Government, the ground taken for the petitioner is not sustainable.

With respect to the points touching the want of evidence to warrant the arrest of the petitioner, we are of opinion that if the petitioner was charged with the crime before a magistrate having power only to commit the accused for trial and to issue his warrant for the arrest of the accused for examination, the evidence would undoubtedly be insufficient to make even a *prima facie* case, and the petitioner would be entitled to his discharge. But here an indictment has been found by a Grand Jury, from which we must assume that sufficient evidence was adduced to warrant the placing of the petitioner upon his trial.

Article 7 of our Constitution, as to the right of an accused to have witnesses against him produced face to face, only applies to persons put upon their trial upon indictment before the Courts of this Kingdom.

It is enough that a reasonable presumption of guilt is apparent and the production of an indictment found charging the crime is sufficient. (Spear, p. 291.)

With regard to the sufficiency of the bench warrant, we think it would have been more regular to have forwarded the original; but the copy is certified by the proper authority, and it purports to be issued under the seal of the court, and we think that the objections are not well taken.

The only remaining point is whether the petitioner is a fugitive from justice. The petitioner claims that by the law of the State of California (Political Code, Sec. 853) he is entitled to be absent from the State for sixty days, and that consequently he is to be treated, not as a fugitive from justice, but as a person lawfully traveling wherever he may please.

We cannot adopt this view, and we think the authorities of the State of California have repudiated such a construction by taking the measures they have. The affidavit of the officer entrusted with the warrant for the arrest of the petitioner is distinct and specific. He says "sought for him at his last known

place of residence and at his place of business and in the market place and at the exchange, and that he could not find the said J. W. McCarthy; and deponent deposes and avers upon his information and belief that the said J. W. McCarthy has fled from justice in the State of California and taken refuge in the Kingdom of Hawaii." We therefore are of opinion, it is sufficiently proven that the petitioner is a fugitive from justice.

We therefore dismiss the petition and remand the petitioner to the custody of the Marshal. Costs to be paid by the petitioner.

## BY JUDD, C. J.

In addition to the opinion of the Court I wish to say that as the crime charged against the prisoner, embezzlement of public funds in a foreign country, is not one of the crimes for which by the treaty between the United States and this Kingdom his extradition could be demanded, the procedure to obtain his surrender is not to be governed by the provisions of the treaty. It is quite true that if the surrender of a fugitive should be demanded as of right under the treaty, this Government would be justified in refusing to comply with it, unless the demand came from the Executive representing the sovereignty of the foreign State.

In the case before us the request of the United States Minister that the prisoner be surrendered to the agent of the State of California is sufficient. The liberty of residents in this Kingdom is fully protected by the statute law which requires a judicial examination into the proof of criminality against them and a judgment as to its sufficiency as a prerequisite to their being excluded from this Kingdom. If it were not for this statute, and a resident of this Kingdom was attempted to be sent abroad to be tried for a crime not extraditable under a treaty, the act of the Executive in arresting him and holding him for surrender would be without law. In such a case the Court would be authorized to interfere by Habeas Corpus.

The policy of this country as evidenced by the statute of 1846, which authorized the arrest of an alien fugitive from justice, and his tender to the accredited representative of the country to which the fugitive belongs, though no demand for his surrender be made, and the present statute passed in 1859, is certainly against making

our shores the asylum for foreign criminals. Many of the dicta quoted from cases in Courts of the United States where the policy is said to be against the surrender of fugitives except under treaty obligations, would have no application here.

### By McCully J.

The eleven points made by the learned counsel for the petitioner cover everything that can be urged on his behalf. But in my view he seriously misapprehends the status of the case with reference to Article XIV of the American treaty, and with reference to treaty stipulations generally.

It is seen by the citations made in the opinion of the Court from the organic laws of 1846, the first systematic laws of this Kingdom, that a full and liberal provision was made against the contingency that the Island Kingdom might became a resort for fugitives from justice. Such might be arrested upon merely the formal demand of a resident foreign representative, or further, upon the mere knowledge that public proclamation had been issued against a fugitive, and be held in custody of the authorities until surrendered to the representative of the foreign government from whose jurisdiction he had fled. These statutes contain no provisions for judicial examination of the grounds for issuing a warrant. The order proceeds immediately from the executive. Furthermore, so careful was the legislation of that time that persons guilty of crime in other countries should not sojourn here, that it is provided that even if the representative of the foreign power refuses to accept the surrender, the offender may be delivered up for transportation, to any armed vessel of his nation.

These provisions of law were made prior to any treaty stipulations concerning extradition, although treaties recognizing the sovereignty and civilization of the Kingdom had been made with France and Great Britain.

The statutes of 1846 being the law of the Kingdom, the Treaty with the United States, embracing Article XIV, providing for extradition, was ratified in August, 1850. There are obvious reasons why the Treaty should be narrower in its terms than the Hawaiian statute. It was of reciprocal obligation, binding the United States to restore like offenders upon like terms to the Hawaiian Government.

It is a universal rule in extradition treaties to specify the extraditable offenses. What is agreed upon becomes obligatory and the claim is of right, not depending upon international comity nor upon the statutes of the State upon which the demand is made. The United States could have entered into no treaty giving extradition in the broad terms of the Hawaiian statute of 1846, while there were very good reasons of policy for this Kingdom to offer the statute to the powers of the world, and there could be no implication that the American treaty curtailed the effect of it by specifying the offenses for which the United States would extradite to Hawaii, and *vice versa*.

In this state of law and treaty, the Civil Code, repealing and superseding the Acts of 1846, was passed May, 1859. Section 449 specifies no offenses. "A crime" is the only designation of the subject on which the statute moves. The mode of proceeding only is changed. There is no appearance of modification due to the American Treaty, which had been in operation nearly ten years. The wise policy of maintaining a statute which would surrender to the justice of foreign powers a wider class of offenders than was stipulated by treaty appears to have still obtained. Enacted after the treaty, it is independent of it, and I see no reason to hold that the treaty abridges the law. This view disposes of one series of the petitioner's objections.

As to the form of the demand. Undoubtedly the State of California cannot maintain diplomatic relations with this or any other foreign power, unless, which I am not informed about, she is included among the Sates which the Republic of Mexico, by treaty with the United States, permits to make extradition demands directly upon her. But here the United States Minister adopts and presents this request, which is not a demand,—only treaty stipulations being demandable—that this Government will put in operation its own statute. In this view, it seems to me nothing more is needed. Indeed the statute requires only "complaint made under oath" before any magistrate by whomsoever may be credible and have a proper relation to the case, to put it in motion. Query: Why could not officer Bee, without the request of the Governor of California, and without the request of the United

States Minister, have demanded a warrant for the apprehension ? These requests, the one and the other, are highly influential, but I do not perceive that they are essential to the operation of the statute. The authority of officer Bee to receive him without special authorization is, however, a different thing from making the complaint.

Now, was the evidence of criminality sufficient to sustain the charge. Doubtless this Court, upon review in *Habeas Corpus* of the sufficiency of evidence, will be held by all the constitutional provisions guaranteeing the rights of personal liberty and of trial upon evidence of witnesses produced face to face, both for the defense and prosecution, which rights belong to all persons being for any time within our jurisdiction.

Without referring to the authorities given in the opinion of the Court, I cite only the result expressed in Spear's Law of Extradition, p. 40, in these words, "The general rule of evidence adopted in the extradition treaties of the United States is, that the charge of criminality on which the demand for delivery is based must be supported by such evidence as would justify the apprehension and commitment for trial of the person accused, if the alleged offense had been committed in the country on which the demand is made." This rule as to treaties may be adopted for action under our statute. We have before us in this case evidence of criminal proceedings commenced in the Court of California. An indictment has been found by at least twelve grand jurors acting upon sworn testimony. A bench warrant has issued thereon for his arrest, and the service thereof has been defeated only by the departure of the petitioner from the country. The case has reached the stage of probable cause and apprehension already in California. "Evidence of criminality" required by Section 449 cannot be taken to mean conviction of guilt. Mr. McCarthy is not to be tried here. He is wanted to be tried in California. The proofs offered here satisfy me that there is no infringement of personal right in rendering him for such trial. On the other hand it would be unreasonable to require more. There is a clear distinction between a mere charge or accusation and a commitment or indictment found. If there were only the first, it would be proper to require here evidence of probable cause on

which a commitment for trial might be made. We are certified that this has already been done. If our statute does not apply to this case it is not easy to see what it was intended to accomplish.

Regarding the jurisdiction of the Court to inquire into the discretion of the Executive in this proceeding it seems to me that when we have determined that the issue of the certificate to the Minister of Foreign Affairs was well based on the statute, we have done all that belongs to us. Upon such certificate given we are not to advise him to issue his warrant, and certainly are not to advise him not to issue it.