Anthony BROWN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3252.

Supreme Court of Alaska.

Oct. 12, 1979.

Walter L. Carpeneti, Asst. Public Defender, Anchorage, Brian Shortell, Public Defender, Anchorage, for appellant.

Rhonda F. Butterfield, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

Anthony Brown appeals from his conviction for first degree murder, felony murder and armed robbery. He also appeals from his sentence of life imprisonment.

The victim in this case was a 23-year old taxicab driver. His body was discovered lying partially in and partially out of his cab which was on a gravel road just off Sheep Creek Road, northwest of Fairbanks at about 12:15 P.M. on May 20, 1976. He had been shot once in the back of the head at close range. Death was instantaneous. Within forty-five minutes of the discovery of the victim's body the defendant Brown was arrested for the murder.

The evidence adduced at trial linking Brown to the murder was impressive. Two eye-witnesses who had been driving by on Sheep Creek Road apparently witnessed the actual shooting, although they did not realize it at the time. They saw a man standing on the passenger side of the cab, apparently talking to the cab driver. As they approached the cab, it suddenly shot forward, evidently out of control, and came to a rest off the side of the road.[1] When the witnesses stopped and asked the man what had happened, he told them the cab had run off the road and waved them on to get help. As they left they observed the man heading back toward the cab. They saw no one else in the area. Both witnesses positively identified the defendant Brown as that man in a lineup held later on that day.

A third witness testified that as he drove past the scene a few minutes later he saw the cab off the road and an individual coming up toward the road. As this witness slowed, the individual waved at him to go on. This witness drove by, but then decided to turn back, thinking there might have been an accident. When he returned to the scene, the person who had waved him on was gone. He and another passing motorist who had stopped went down to the cab and found the victim's body laying half out of the cab with the cab door open.

The driver of a school bus testified that he was flagged down by a pedestrian on Sheep Creek Road near where the murder took place. The pedestrian told him he needed to get to a phone quickly. The bus driver let the individual off at the east entrance to the University of Alaska. A few minutes later, the bus driver was stopped by police investigating the murder. He accompanied them back to the College Inn Grocery near the University, where he positively identified Brown as the man who had flagged him down.

Both the bus driver and a passenger on the bus testified that Brown was carrying gloves when he stopped them. Later police investigation showed that a small cross marked in blood on the victim's driver's door window had been traced by a gloved hand.

Scientific evidence showed that the bullet that killed the victim had come from a .44 caliber S&W Special Charter Arms revolver.[2] The state showed that the defendant had stayed the night before the murder with a friend who owned such a revolver. The friend had showed the pistol to Brown that night. On the evening after the murder, Brown's friend reported to police that the pistol and a box of ammunition were missing. A specialist in neutron activation analysis testified that the bullet taken from the victim and a bullet fired from the revolver several days before it was stolen had come from the same batch of ammunition: they had been made by the same manufacturer on the same day and at the same hour.

---

1. It was the state's theory that this was caused by the victim's dying reflex as he was shot. They argued that his foot slipped from the brake to the accelerator pedal of the car, which was running and in gear at the time. Scientific testimony supported the theory.

2. The actual murder weapon was never recovered. The ground near where the murder occurred was muddy and covered with pools of standing water.

An expert testified that he had found human blood on the clothes worn by Brown when arrested and that at least one blood-stain was of the same type as the victim's. Another expert testified that he had taken swabs from the defendant's hands and that those taken from the defendant's left hand tested positive for barium and antimony, substances released when a weapon is fired. This expert also testified that traces of these substances are very easily removed and will usually not remain more than a few hours after a gun is fired.

Police found a vial containing hashish oil laying on the ground between the cab and the highway. When arrested, Brown was carrying several similar containers. The victim's wallet, the murder weapon, and the gloves were never recovered.

Brown's testimony was that he had hitch-hiked to the area of the homicide to look over property owned by his grandparents. He was walking to the highway when he heard the sound of a car engine revving up. When he went to investigate, he found the cab standing off the road, in gear, with the motor running. Upon approaching the cab, he saw the victim, opened the door, and shook him, asking if he was all right.[3] He then went up to the road to get help where he flagged down the two witnesses who later identified him. He testified that he did not remain at the scene because he did not wish to become involved while carrying hashish oil. He explained the antimony and barium traces by testifying that he had gone target shooting with a friend the night before the murder.

On appeal, Brown claims that remarks made by the prosecutor in closing argument were improper and prejudicial, that the court erroneously admitted certain evidence at trial, that the court erred in denying his motion for acquittal on the ground that

there was insufficient evidence of robbery to sustain the robbery and felony murder convictions, that he was deprived of his right to a fair and impartial jury, and that he received ineffective assistance of counsel.

## I

### PROSECUTOR'S CLOSING STATEMENT

Brown first argues that his conviction must be reversed because of improper remarks made by the prosecutor in his closing argument. The prosecutor told the jury that:

> When this defendant walked into the courtroom, like every citizen in the State of Alaska, he was entitled to be presumed innocent until proven guilty. He was entitled to bail until proven guilty. At this point in time, ladies and gentlemen, he is no longer entitled to these constitutional rights. Because the people in this State have proven, beyond a reasonable doubt, that he is guilty of first degree murder, and that he is guilty of armed robbery.

No objection was made at trial. On appeal, the defense argues that this is an incorrect statement of the law because the presumption of innocence continues until the jury reaches a verdict of guilty. Brown further argues that, since a constitutional right is involved and the error cannot be said to be harmless beyond a reasonable doubt, it is *per se* plain error,[4] requiring reversal.

 We agree that the prosecutor's remarks were an incorrect statement of the law. It is clear that the presumption of innocence remains with the defendant until a guilty verdict is reached.[5] However, since no objection was made to these remarks at trial, in order for this court to consider this matter on appeal, plain error must be

---

3. Shortly after he was arrested Brown had told police that the door was already open when he got to the taxi. Brown was impeached for numerous discrepancies between his original statement to police and his testimony at trial.

4. *Citing Martin v. State*, 517 P.2d 1399 (Alaska 1974).

5. *See, e. g., United States v. Thaxton*, 483 F.2d 1071, 1074 (5th Cir. 1973); *United States v. Cummings*, 468 F.2d 274, 280 (9th Cir. 1972); *State v. Bellanceau*, 367 A.2d 1034, 1037 (Me. 1977); *State v. Elliott*, 383 P.2d 382, 385 (Or. 1963).

shown.[6] This court has often stated that to constitute plain error, an error or defect must be obvious, affect substantial rights, and be obviously prejudicial. *Gilbert v. State*, 598 P.2d 87 (Alaska 1979); *Evans v. State*, 550 P.2d 830 (Alaska 1976); *Dimmick v. State*, 449 P.2d 774 (Alaska 1969). We have also held that where the error *denies* a constitutional right, by definition a substantial right is affected, and reversal is required unless the error is found to be harmless beyond a reasonable doubt. *Martin v. State*, 517 P.2d 1399 (Alaska 1974); *Burford v. State*, 515 P.2d 382 (Alaska 1973). However, we have never held that the standard of harmless beyond a reasonable doubt applies merely because a constitutional right is involved. While it is true that a constitutional right, the right to the presumption of innocence, is involved here, we believe that the instructions given by the judge both before the trial and before the jury's deliberations were sufficient to ensure that the defendant enjoyed that right and therefore no constitutional right was denied. Prior to trial the court expressly instructed the jury that the presumption of the defendant's innocence remains throughout the trial and jury deliberations and can be overcome only by evidence of guilt which convinces beyond a reasonable doubt. At the end of the trial the court gave further instructions on the presumption of innocence and the burden of proof, and warned the jury that:

> Arguments, statements and remarks of counsel are intended to help you in understanding the evidence and applying the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark. . . .

We are convinced that the court's instructions prevented the error from rising to the level of plain error.

6. Crim.R. 47(b) states:
 Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

7. *See also L.E. Spitzer Co., Inc. v. Barron*, 581 P.2d 213, 217–18 (Alaska 1978); *Braham v. State*, 571 P.2d 631, 643 n. 17 (Alaska 1977); *Bachner v. Rich*, 554 P.2d 430, 446 (Alaska

II

## ADMISSION OF STATE'S EXHIBIT EE

Brown next contends that the admission into evidence of State's Exhibit EE, a .44 caliber S&W Special Caliber Charter Arms Bulldog Revolver, was reversible error. The gun was admittedly not the actual murder weapon. The state argued, however, that it was identical to the murder weapon, and exhibited it to witnesses and jurors on several occasions. Brown claims that, since there was no actual connection between the gun exhibited at trial and the crime, the gun was irrelevant and that its admission was both prejudicial and an unwarranted judicial comment on the evidence.

In *Poulin v. Zartman*, 542 P.2d 251 (Alaska 1975), we reaffirmed our earlier statements regarding the test of relevancy:

> Alaska case law defines the test of relevancy. 'To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case.' *Hutchings v. State*, 518 P.2d 767, 769 (Alaska 1974). The dual concepts of logical relevance, *i. e.*, some tendency to establish the ultimate point for which the evidence is offered, and materially [sic], *i. e.*, germaneness of the ultimate point to issues in the trial, have been emphasized repeatedly in our opinions.

*Id.* at 260 (footnote omitted).[7]

The state claims that the weapon was relevant to three material issues at trial: 1) the defendant's access to a .44 caliber Charter Arms Bulldog Revolver; 2) the defendant's opportunity to commit the crime; and

1976); *Newsom v. State*, 533 P.2d 904, 908 (Alaska 1975); *Gordon v. State*, 501 P.2d 772, 774 (Alaska 1972); *Hartsfield v. Carolina Cas. Ins. Co.*, 451 P.2d 576, 578 (Alaska 1969); *Smith v. State*, 431 P.2d 507, 509 (Alaska 1967); *Battese v. State*, 425 P.2d 606, 610 n. 8 (Alaska 1967); *Mitchell v. Knight*, 394 P.2d 892, 894 (Alaska 1964); Alaska R.Evid. 401.

3) the concealability of the weapon. We agree with the defendant that there does not appear to be any logical connection between the gun exhibited at trial and the proposition that the defendant had access to a similar gun or the proposition that the defendant had an opportunity to commit the crime. Merely exhibiting an identical revolver has no tendency to establish either of these points. With respect to the concealability of the weapon, the state argues that the revolver was logically useful to demonstrate that the defendant could have concealed the murder weapon immediately after the murder. The two eyewitnesses who spoke to Brown immediately after the shooting testified that Brown was not carrying anything when he ran up to them on Sheep Creek Road. Exhibit EE tended to show to the jury that Brown could have concealed the murder weapon before he approached the witnesses.

The difficulty with this argument is that the weapon was never offered for this purpose. The state exhibited the weapon to the jury on several occasions, but never raised the concealability question when doing so. Nor was this point argued at closing argument. The weapon was offered "for the purposes of demonstration to the jury." No mention was made of what the exhibit was supposed to be demonstrating. Evidence which is inadmissible for one purpose may nevertheless be admitted if it is relevant to a different, valid purpose,[8] but that rule does not exist to give parties an opportunity to search through the record and come up with a post-trial justification for evidence that was presented at trial. Under the circumstances, Exhibit EE was irrelevant to the issues for which it was offered, and its admission into evidence was error.

To warrant reversal of Brown's conviction, however, we must find that the admission of the weapon was not harmless.

Brown argues that he was prejudiced because the judge's admission of the evidence constituted a ratification of the state's theory that a .44 caliber Charter Arms Revolver had been the murder weapon. We disagree. Admission of Exhibit EE was no more tantamount to judicial endorsement of the state's theory than is the admission of any evidence which pertains to a disputed issue. Moreover, the judge instructed the jury, both before the trial and at the end of the trial, that when he allowed evidence to be admitted over counsel's objection he was not expressing an opinion as to the weight or credibility of the evidence. We do not see how, under the circumstances, the admission of the gun could have been considered by the jury to be a judicial endorsement of the prosecutor's theory of the case.

Brown also argues that the admission of Exhibit EE caused the jury to improperly infer that the murder weapon was a .44 caliber Charter Arms Revolver. He cites Wigmore for the proposition that:

> [T]here is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. . . .[9]

We see little danger of such prejudice under the circumstances of this case. The jury was plainly aware that the pistol exhibited was not the actual murder weapon and that the murder weapon had never been found. Moreover, the other evidence showing that the murder weapon was a .44 Caliber Charter Arms Revolver was extensive and extremely persuasive. This evidence was introduced by various forensic experts. In light of the volume and nature of this testimony, it can be fairly said that the impact of Exhibit EE was not such as to have "appreciably affected the verdict."[10] We find the error in admitting Exhibit EE to have been harmless.

---

8. *See* Alaska R.Evid. 105. *See also Low v. Honolulu Rapid Transit Co.*, 5 Haw. 582, 445 P.2d 372, 376 (1968); *Hockett v. Salem Private Schools*, 279 Or. 453, 568 P.2d 663, 664 (1977); C. McCormick, Handbook of the Law of Evidence, (2d Ed.1972) § 59.

9. 4 J. Wigmore, *Evidence*, § 1157 at 340 (Chadbourn rev. 1972).

10. *Love v. State*, 457 P.2d 622, 632 (Alaska 1969).

## III

### MOTION FOR ACQUITTAL

Brown next claims that the court erred in denying his motion for acquittal on the robbery and felony murder charges. Brown contends that there was not enough evidence of robbery to support the charges.

■ When presented with an appeal from a denial of a motion for acquittal, the appellate court must view the evidence and the inferences drawn therefrom in the light most favorable to the state. If the court determines that "fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt," the lower court should be affirmed, since that is the quantum of evidence required to warrant submitting the issue to the jury. *Bush v. State*, 397 P.2d 616, 618 (Alaska 1964).

■ The state's theory was that the defendant was desperate for money. There was evidence that the defendant possessed $1,400 worth of hashish which he had not paid for and was trying to sell just prior to the homicide. He had stolen guns and a camera from his father's home a few days before the murder. He also told a friend that he had to pick up some cocaine at the airport. When the body of the victim, a taxi driver, was found, there was no wallet on him or in the cab. There was testimony that the victim had been seen with his wallet approximately two hours before the crime. The victim's driver's license and chauffeur's card, which he was required to carry while working, also were not found. His empty money clip was found in the taxi cab. Although the doors were closed when the victim was murdered, the door on the driver's side of the vehicle was open when the body was found, and the body was partly in the cab and partly on the ground. The lining of the victim's front right pocket was pulled out.

This evidence was sufficient to place the robbery question before the jury. The trial court did not err in denying the motion for acquittal.

## IV

### DENIAL OF THE RIGHT TO A FAIR AND IMPARTIAL JURY

Brown contends that his right to a fair and impartial jury was infringed in two ways. First, he contends that pretrial publicity made a fair trial impossible in the Fairbanks community and that his motion for a change of venue was improperly denied. He claims that this error was compounded by failure of both the court and trial counsel to conduct an effective voir dire of prospective jurors. Second, he claims a violation of his rights because of the court's failure to examine the jurors regarding an allegedly prejudicial newspaper story that appeared during the trial.

#### A. *Change of Venue.*

The murder received extensive media coverage in the period immediately after Brown was arrested. On the day of the incident, the Fairbanks *Daily News-Miner* carried front page headlines and photographs of Brown's arrest. These were followed by a second front page story the next day. Two days later a story appeared about the long line of taxicabs which had formed a funeral procession for the victim. The following day, on page three, the paper reported on the defendant's bail hearing, at which the judge reduced bail. On May 28, 1976, the *All-Alaska Weekly* published a front page story devoted to the murder. A second story in the paper was captioned "Victim's Roommate Spearheads Trust Fund for Three-Year Old Daughter." Finally, on May 29, 1976, the *Daily News-Miner* reported on page three about the defendant's preliminary hearing. In addition, it appears that the murder received radio and television news coverage. Each of the news stories contained some details and evidence regarding the case. After May 29, no stories appeared regarding Brown or the murder until after the start of the trial on September 7, 1976.

The defendant's attorney moved for a change of venue, arguing that the news

coverage made it impossible for Brown to receive a fair trial in the Fairbanks area. The motion for change of venue was denied without comment on July 8, 1976.

The superior court may grant a change of venue under AS 22.10.040(1) "when there is reason to believe that an impartial trial cannot be had . . . ." This court has twice held that a lower court's decision whether to grant a change of venue motion will be reversed only if the decision amounted to an abuse of discretion.[11]

Brown argues that in light of the United States Supreme Court's decision in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the court should abandon the abuse of discretion standard when the issue is whether a change of venue is necessary to protect a defendant's right to a fair trial. Brown urges the court to make a *de novo*, independent evaluation of the circumstances of the case to determine whether the motion for a change of venue should have been granted.

In *Sheppard*, the Court overturned a conviction for murder because publicity surrounding the trial had prevented a fair trial. The court held that it was unable to conclude that the influence of the extensive pretrial publicity on the trial, by itself, deprived Sheppard of due process. However, it did state that:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, and trial courts must take strong measures to ensure that the balance is never weighed against the accused. *And appel-*

*late tribunals have the duty to make an independent evaluation of the circumstances.* Of course there is nothing that proscribes the press from reporting events that transpire in the courtroom. *But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.*

384 U.S. at 362–63, 86 S.Ct. at 1522, 16 L.Ed.2d at 620 (emphasis added).

Based on this language, the California Supreme Court held in *Maine v. Superior Court*, 438 P.2d 372 (Cal.1968) that the reviewing court must look at the change of venue question *de novo*.[12] California appears to read *Sheppard* to mean that "if, on balance, we would have granted a change of venue were we in the trial judge's place, we must reverse his denial of a venue change.[13]

■ We do not read such a sweeping message into *Sheppard*. The case does not require an appellate court to ignore the fact that the lower court has determined that a change of venue is unnecessary. A decision whether to grant or deny a change of venue motion depends on the extent to which pretrial publicity is prejudicial and the extent to which the publicity has affected the ability of potential jurors to be fair and impartial. These are questions well suited for evaluation by the trial judge. This is especially true where the motion is made or renewed during jury selection. We note that, the language of *Sheppard* notwithstanding, a number of courts still apply the abuse of discretion standard in reviewing change of venue motions based on pretrial

---

11. *Maier v. City of Ketchikan*, 403 P.2d 34, 39 (Alaska 1965); *Marrone v. State*, 359 P.2d 969, 977 (Alaska 1961).

12. *Maine* arose on petition for mandamus before trial, and the state seeks to limit its holding to pretrial review of change of venue motions. However, the California court seems clearly to have adopted the standard for both pre and post-trial review. *See People v. Tidwell*, 3 Cal.3d 62, 68, 89 Cal.Rptr. 44, 49, 473 P.2d 748, 753 (1970). The state of Washington

also appears to conduct an independent review, even though it has retained the abuse of discretion language. *See State v. Stiltner*, 80 Wash.2d 47, 491 P.2d 1043, 1048 (1971); *State v. Haynes*, 16 Wash.App. 778, 559 P.2d 583, 587 (1977); *State v. Warwick*, 16 Wash.App. 205, 555 P.2d 1386, 1389 (1976).

13. *People v. Tidwell*, 3 Cal.3d 62, 68, 89 Cal. Rptr. 44, 49, 473 P.2d 748, 753 (1970).

publicity.[14] Because we believe that some deference must be accorded the trial court's determination, we hold that, in making the "independent evaluation of the circumstances surrounding trial," we will "accord due deference to the informed discretion of the trial judge"[15] and reverse only where we believe that he has abused his discretion in denying the change of venue motion.

■■■■■ With respect to the substantive standard to be applied by the trial court, Brown properly points out that under *Sheppard* a change of venue must be granted if there is a reasonable likelihood that prejudicial publicity will prevent a fair trial.[16] The Supreme Court provided a clarification of this somewhat nebulous standard in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), in which it held that the defendant received a fair trial despite widespread publicity regarding his trial and his prior criminal activities. The Court distinguished prior cases finding due process violations[17] by characterizing them as "utterly corrupted by press coverage" and "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." 421 U.S. at 798–99, 95 S.Ct. at 2036, 44 L.Ed.2d at 594. The Court held that there is no due process violation, even if jurors are aware of the facts and issues involved in the case, so long as the juror can lay aside his or her impression or opinion and decide the case solely on the evidence presented.[18] Under *Murphy* the focus of a change of venue decision is on the voir dire. Prior to voir dire, the change of venue motion need not be granted unless the pretrial publicity is so prejudicial that it appears highly unlikely that an impartial jury can be selected. 421 U.S. at 799–800, 95 S.Ct. at 2036, 44 L.Ed.2d at 594.[19]

■■■ No such publicity attended the present case. The media coverage of the murder and Brown's arrest was confined approximately to the one week period immediately following the crime. The coverage consisted primarily of factual reportage, not all of it unfavorable to Brown. There were no editorial denunciations of Brown, and there were no blatantly emotional stories regarding the defendant or the victim. There were no stories about the case from May 29 until after the trial began in early September, a period of over three months. Although portions of the news stories presented Brown in an adverse light, the coverage comes nowhere near that which the Supreme Court has found sufficient to require a change of venue prior to voir dire.[20]

---

**14.** *See, e. g., State v. Watson*, 114 Ariz. 1, 559 P.2d 121, 131 (1976); *Green v. State*, 221 Kan. 75, 558 P.2d 110, 111 (1976); *Hammons v. State*, 560 P.2d 1024, 1029 (Okla.Cr.1977); *State v. Herrera*, 32 Or.App. 397, 574 P.2d 1130, 1133 (1978); *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 291 (Pa.1978).

**15.** *See United States v. Jones*, 542 F.2d 186, 194 (4th Cir. 1976); *State v. Keliiholokai*, 569 P.2d 891, 895 (Hawaii 1977).

**16.** 384 U.S. at 362–63, 86 S.Ct. at 1522, 16 L.Ed.2d at 620.

**17.** These are, in addition to *Sheppard, Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

**18.** This is quite similar to the test adopted in *Marrone v. State*, 359 P.2d 969 (Alaska 1961) where the court stated:

> The true test to be applied is whether they [potential jurors] had formed a fixed opinion as to the guilt or innocence of the defendant from what they may have read or heard about the case.
>
> *Id.* at 977.

**19.** *See also United States v. Sinclair*, 424 F.Supp. 719, 721 (D.Del.1976) and *United States v. Mandel*, 415 F.Supp. 1033, 1065 (D.Md.1976) (absent extraordinary circumstances, decision to change venue should await voir dire); *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 291 (1978) (absent extraordinary circumstances defendant must show actual prejudice in the empaneling of the jury).

**20.** *Maine v. Superior Court*, 68 Cal.2d 375, 66 Cal.Rptr. 724, 438 P.2d 372 (1968), upon which appellant heavily relies, is also distinguishable. There the defendants were accused of committing a grave crime in a small community; the victims were popular and from respected families; the papers covered the case prominently

Nor did the voir dire indicate any need for a change of venue. Prior to voir dire the trial judge asked the members of the venire whether anyone had heard of the case. Apparently a number of potential jurors had. The trial judge then asked the venire whether anyone thought their exposure to the case might prevent them from being impartial jurors. No one indicated that it would.[21] Defense counsel's questioning did not uncover any indications of bias either. A full jury of twelve plus one alternate juror were sworn in after only twenty-four potential jurors were questioned.[22] None of the jurors indicated that they had formed an opinion as to the defendant's guilt or innocence. Brown's attorney was apparently satisfied with the jury, as he did not renew his motion for a change of venue after the jury had been selected. In light of the record and the holding in *Murphy*, we find nothing to indicate that the trial judge abused his discretion in deciding not to grant the change of venue motion.

Brown claims that although the record does not show bias, this is merely because the record itself is inadequate. He argues that the voir dire was so deficient that no bias, if it existed, would have been uncovered.

█ We agree with the defendant that where a potential juror may have been exposed to prejudicial publicity, or admits to having knowledge of a case, the defendant should be given an opportunity to make a searching inquiry designed to uncover objective facts upon which a judgment of bias

can be made.[23] Numerous cases challenging verdicts because of pretrial publicity have turned on the fact that the voir dire conducted was adequate to protect against bias.[24] The intensity of the questioning which should be permitted on voir dire depends on the nature, extent and timing of the pretrial publicity in the case.[25]

█ In this case, however, we find no error in the court's handling of the jury voir dire. The court made preliminary inquiries into the jury venire's exposure to the publicity. This general questioning indicated that although many of the venire members had heard of the case, none of them had formed a fixed opinion as to Brown's guilt or innocence. All of them indicated that they believed they could try the case fairly. The court then allowed defense counsel to make any further inquiries he desired. Given the nature of the publicity complained of, the time that had elapsed since the publicity had occurred, and the fact that counsel was given a free hand in making further inquiries, the court did not have a duty to independently carry out a more detailed examination.[26] If defense counsel had been dissatisfied with the court's voir dire he could have gone further with his questioning.

This is not a case in which massive pretrial publicity made any jury panel suspect, as in *Sheppard*. Nor is this a case where defense counsel attempted to question the jurors but was prevented from doing so by the trial judge. Having made preliminary inquiries, and then having given counsel a

and generated community-wide support for the victims; the defendants were strangers to the community and, most importantly, police investigators had told the media about a purported confession and that the defendants were wanted for murder in another state.

21. One member of the jury panel thought she might be a "little prejudiced." However her name was never called to join the venire, and she did not serve on the jury.

22. The defense used only seven of its ten peremptory challenges.

23. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589, 595 (1975); *Silverthorne v. United States*, 400 F.2d 627, 640 (9th

Cir. 1968); *State v. Pokini*, 65 Haw. 640, 526 P.2d 94, 100 (1974).

24. *See, e. g., Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975); *Calley v. Callaway*, 519 F.2d 184, 208–09 (5th Cir. 1975); *People v. Preston*, 9 Cal.3d 308, 107 Cal.Rptr. 300, 508 P.2d 300, 303 (Cal. 1973).

25. *State v. Pokini*, 56 Haw. 597, 526 P.2d 94, 99 (1974).

26. *See United States v. Giacalone*, 574 F.2d 328, 335 (6th Cir. 1978).

free hand to inquire further, the trial judge did everything necessary to adequately protect the defendant's rights.

### B. *Publicity During Trial.*

■ During the trial, a newspaper story appeared in the *Daily News-Miner* regarding the case. Although the record does not include a copy of the article, both sides agree that it contained a number of inaccuracies. Defense counsel requested that the jurors be asked whether they had seen the story, and announced his intention to request a mistrial if anyone had. Instead, the trial judge informed the jury that an article containing inaccuracies had appeared, and repeated his prior instructions not to look at any publicity concerning the trial. Brown now claims that this was inadequate.

Although this court has not previously addressed the question of how to respond when jurors may have been exposed to publicity during trial, many other jurisdictions have discussed the problem. The procedure most widely followed involves several steps. When publicity about a trial occurs while the trial is in progress, the trial court must first determine whether there is a substantial reason to fear prejudice. If there is, the court must then ask the jury whether anyone has been exposed to the publicity. If so, the court must conduct a further examination of the individual juror out of the presence of the other jurors to ensure that the fairness of the trial has not been compromised.[27]

■ It is not necessary for the court to question jurors every time publicity about a trial appears. An examination is necessary only if the court makes the threshold determination that there is a serious possibility of prejudice.[28] This initial determination should be based on a consideration of how closely related the publicity is to the case, its timing, its prominence, its tone, and the likelihood that the jury was exposed to it.[29]

The offending article in this case is not part of the record. We must therefore rely on the transcript of defense counsel's objections to determine what was prejudicial about it. The only inaccuracy of substance brought to the trial court's attention was an erroneous statement that drug paraphernalia had been found inside the victim's taxicab. In fact, the items were found thirty-five to forty feet away from the cab. The defendant claims that, since there was no other evidence directly placing the defendant in the cab, this erroneous report significantly strengthened the state's case.

■ Since the erroneous report did bear on a factual issue at trial in a manner adverse to the defendant, we agree that it would have been better for the trial court to have asked the jurors whether any of them had read the newspaper article.

27. *See, e. g., United States v. Herring,* 568 F.2d 1099, 1104–05 (5th Cir. 1978); *United States v. Perrotta,* 553 F.2d 247, 250 (1st Cir. 1977); *United States v. Jones,* 542 F.2d 186, 191 (4th Cir. 1976); *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir. 1969); *State v. Keliiholokai,* 569 P.2d 891, 894 (Hawaii 1977); *Lindsey v. State,* 260 Ind. 351, 295 N.E.2d 819, 824 (1973); *State v. Clay,* 7 Wash.App. 631, 501 P.2d 603, 611–12 (1972). This approach is similar to the one recommended by the American Bar Association. *See* American Bar Association, Standards Relating to Fair Trial and Free Press § 8–3.6(f) (2d Ed. Tentative Draft 1978).

28. *United States v. Herring,* 568 F.2d 1099, 1104 (5th Cir. 1978); *United States v. Jones,* 542 F.2d 186, 194 (4th Cir. 1976); *United States v. Hankish,* 502 F.2d 71, 77 (4th Cir. 1974); *State v. Keliiholokai,* 569 P.2d 891, 895 (Hawaii 1977); *Bruce v. State,* 375 N.E.2d 1042, 1063 (Ind.1978); *State v. Bazinet,* 372 A.2d 1036, 1039 (Me.1977).

The determination whether the publicity is so prejudicial that further inquiry is necessary is within the trial court's discretion. *See United States v. Jones,* 542 F.2d 186, 195–96 (4th Cir. 1976); *Booton v. Hanauer,* 541 F.2d 296, 298 (1st Cir. 1976); *Gordon v. United States,* 438 F.2d 858, 872–73 (5th Cir. 1971); *State v. Keliiholokai,* 569 P.2d 891, 895 (Hawaii 1977); *Bruce v. State,* 375 N.E.2d 1042, 1063 (Ind. 1978); *State v. Bazinet,* 372 A.2d 1036, 1040 (Me.1977).

29. *United States v. Herring,* 568 F.2d 1099, 1104–05 (5th Cir. 1978); *Gordon v. United States,* 438 F.2d 858, 873 (5th Cir. 1971); *see United States v. Jones,* 542 F.2d 186, 195–96 (4th Cir. 1976); *State v. Bazinet,* 372 A.2d 1036, 1039 (Me.1977).

Nevertheless, we do not find that the trial court's failure to do so was reversible error. Early in the trial, the court instructed the jurors to avoid reading or listening to any news or publicity about the case. This warning was repeated several times throughout the trial, including the evening that the newspaper report appeared. Moreover, when defense counsel brought the offending article to the trial judge's attention the trial judge again gave a specific and detailed admonition to the jury.[30] The admonition apparently satisfied defense counsel, and no further request for voir dire or motion for a mistrial was made.[31]

The evidence connecting Brown to the murder scene at the moment of the murder was highly persuasive, and is set forth *supra*, p. 224. Therefore, we cannot say that the court's decision not to ask jurors whether they had read the newspaper article affected Brown's rights in any way.

**30.** The Court: The News-Miner had an article in it last night which is a good example of why I give you the warnings not to read those articles, and if you do, to ignore them. I'm presuming that no one had read it. But in the event that you did stumble on to it, that's why we don't want you to read them. It was grossly inaccurate and had no reflection as [sic] to anything that happened in the courtroom. It's hard for me to believe that the reporter was here, although I saw her. So. . . .
(Laughter)
The Court: It's even more important, when we have reporting like that, that you just make an effort not to see those things. If you do notice anything printed about the trial, why make a real valid effort not to read it, because it's just ridiculous. Okay. Mr. Davis, next witness.
Although the trial court is not justified in relying solely on admonitions to the jury, *see United States v. Pomponio*, 517 F.2d 460, 463 (4th Cir. 1975) the nature and timing of these warnings is relevant in determining whether a jury voir dire is necessary. *United States v. Herring*, 568 F.2d 1099, 1105 (5th Cir. 1978); *see United States v. Taylor*, 569 F.2d 448, 454 (7th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1269, 55 L.Ed.2d 803 (1978); *Booton v. Hanauer*, 541 F.2d 296, 298 (1st Cir. 1976); *State v. Bazinet*, 372 A.2d 1036, 1040 (Me.1977).

**31.** On September 9th, a second newspaper article appeared. Defense counsel requested a second instruction to the jury stating:

V

## EFFECTIVE ASSISTANCE OF COUNSEL

Brown's next claim is that he did not receive effective assistance of counsel at the trial.

Both the United States Constitution and the Alaska Constitution guarantee to all defendants the right of assistance of counsel.[32] This guarantee includes the right to *effective* assistance.[33] The test that Alaska uses to determine whether a defendant's right to effective assistance of counsel has been violated was articulated in *Risher v. State*, 523 P.2d 421 (Alaska 1974). There we stated that defense counsel must:

perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

I know the court has already done this very satisfactorily, anyway, but on page 3 of the Daily News-Miner, there appears another humungous [sic] article about my client. And I would ask the court to specifically instruct the jurors to pay no heed to the media.

The court did so at the end of the proceedings that day:

Please don't form any final opinions in the case until you've heard all of the evidence, and the case has been given to you for deliberation. Don't discuss it; don't let anyone discuss it with you, and that includes members of your family. They'll know by now where you are and what you're doing, and after the case is over, why, you can tell them about it. But, not during it. I've been informed that there's a lengthy article concerning this case in the News-Miner. Please don't read it, and don't let anyone talk to you about what it says. The evidence is what you hear from the witness stand, and that's all. And you shouldn't allow anything to be presented to you.

**32.** U.S.Const. amend. VI; Alaska Const. art. I, § 11. The federal guarantee was made applicable to the states in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

**33.** *McCracken v. State*, 521 P.2d 499, 508 (Alaska 1974).

*Id.* at 424 *quoting Beasley v. United States,* 491 F.2d 687, 696 (6th Cir. 1974). We stated further that a defendant must show that the conduct of counsel has contributed to the conviction before reversal is required.

> In effect, we are promulgating a two-pronged test. Before reversal will result, there must be a finding that counsel's conduct. either generally throughout the trial or in one or more specific instances did not conform to the standard of competence which we have enunciated. Secondly, there must be a showing that the lack of competency contributed to the conviction. If the first burden [is] met, all that is required additionally is to create a reasonable doubt that the incompetence contributed to the outcome.

*Id.* at 425 (footnote omitted).[34] The defendant is not entitled to error-free representation. Nor will the court second guess trial counsel on the basis of hindsight. All that is required is that counsel's representation fall within the range of reasonable actions which might have been taken by an attorney reasonably skilled in the criminal law, regardless of the outcome.[35]

Brown points to eight specific areas in which he alleges his trial counsel was deficient. The first two shortcomings relate to the failure to conduct a meaningful voir dire. Brown argues that defense counsel had a duty to make an extensive *in camera* inquiry into possible prejudice of the jury panel, stating, "[i]n these circumstances, it is clearly incumbent upon defense counsel to conduct a probing and comprehensive voir dire." Brown cites cases stressing the importance of voir dire, and refers to ABA Standards regarding pretrial publicity[36] to show that because defense counsel's voir dire did not rise to the levels suggested by those authorities Brown was deprived of effective assistance of counsel.

■■■■ Brown confuses the standard for showing that an attorney was not competent under the first part of the *Risher* test. We need not disagree with the authorities cited by Brown as to the desirability of comprehensive voir dire to hold that defense counsel in this case acted in an adequate manner. It is not enough for Brown to show that certain things could have been done. Decisions on such matters as whether to question potential jurors extensively *in camera* are within the attorney's professional judgment. The standard under *Risher* is whether, at the time the decision was made, the judgment fell below a minimum level of competence.[37] The possibility of prejudice was explored by the trial court and by counsel, albeit not as extensively as Brown now would require. We cannot say that no competent attorney with reasonable skill in criminal law would have been satisfied with the voir dire that took place. We thus find no ineffective assistance on this point.

With respect to the other shortcomings alleged by Brown, we have reviewed them and determine that, taken singly or together, they do not warrant reversal of his conviction under the *Risher* standard.

---

**34.** In adopting this test, the court rejected the so-called "farce and mockery" test. The majority of federal jurisdictions have either explicitly abandoned the "farce and mockery" test or substantially backed away from a harsh application of the rule. *See* Annot. *Effective Representation by Counsel,* 26 A.L.R.Fed. 218 (1976). The United States Supreme Court has not directly addressed the question since *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) in which it held that in order to show a violation of constitutional rights the defendant had to demonstrate that defense counsel's advice to plead guilty had fallen outside the range of competence demanded of attorneys in criminal cases.

**35.** *Id.* at 424. *See Moore v. United States,* 432 F.2d 730, 736–37 (3d Cir. 1970); *Green v. State,* 579 P.2d 14, 16 (Alaska 1978). *See also United States v. Agurs,* 427 U.S. 97, 102 n. 5, 96 S.Ct. 2392, 2397, n. 5, 49 L.Ed.2d 342, 349 n. 5 (1976) (counsel failed to request that Government produce criminal record of victim in murder case under mistaken impression that it was inadmissible; no ineffective assistance of counsel).

**36.** *See* American Bar Association, Standards Relating to Fair Trial and Free Press § 8–3.4(a) (2d Ed. Tentative Draft 1978).

**37.** 523 P.2d at 424.

## VI

### SENTENCE APPEAL

Brown's final point on appeal is a challenge to his sentence to life imprisonment. He argues that the court mistakenly failed to consider whether Brown was a "worst offender" before imposing the maximum sentence, and argues that the sentence itself was excessive.

The defendant was twenty-two at the time of sentencing. He had no felony record. He dropped out of high school in his senior year but has since earned an equivalency diploma. He appears to have been unemployed at the time the crime was committed, but a generally favorable evaluation was given the trial court by Fluor Alaska, Inc., regarding his work as a material coordinator between 1974–76. There was evidence that Brown sold and used hashish oil and cocaine, but not narcotics. Brown testified he was under the influence of hashish just prior to the time at which the murder occurred.

In sentencing Brown to life imprisonment, the trial court stated:

> Under *Donlun* the court is to consider whether or not the offender is the worst type within his class. I tend to think that that's probably a consideration that doesn't need to be made in this type of case where the class that you're dealing with starts at the bottom line with First Degree Murder and Armed Robbery. The entire class is made up of the worst offenders.

Although we are unwilling to say that a person convicted of first degree murder is automatically a "worst offender," a review of our recent decisions indicates that Judge Blair's assumptions were not far from the mark. Since 1970 we have reviewed life sentences after first degree murder convictions on six occasions to determine whether the sentence was excessive. In each instance we have affirmed the sentence.[38] In *Wilson v. State*, 582 P.2d 154 (Alaska 1978), we upheld the life sentence of a defendant whose pre-crime history was exemplary. Wilson was sixty-six, had no prior record, had been honorably discharged, was not addicted to drugs or alcohol, and was active in civic affairs. We affirmed a sentence of life imprisonment imposed after he shot and killed an innocent man he mistakenly believed had assaulted his wife two weeks earlier. The crime in the instant case was worse. It was cold-blooded. No passion or justification is indicated. The motive for the killing appears simply to have been robbery.

Given the calculated nature of the crime, the trial court, upon reviewing the *Chaney* criteria, found rehabilitation a slim possibility and a predictably long process, during which confinement was warranted. He thought deterrence of future criminal conduct by Brown not likely. Finally, the court found community condemnation to be at its maximum in a case of this nature. These conclusions were in accord with the recommendations made in the probation officer's report. We find that sentence of life imprisonment was not excessive.

AFFIRMED.

---

**38.** *Bendle v. State*, 583 P.2d 840, 845 (Alaska 1978); *Morgan v. State*, 582 P.2d 1017, 1029–30 (Alaska 1978); *Wilson v. State*, 582 P.2d 154, 156–57 (Alaska 1978); *Hampton v. State*, 569 P.2d 138, 150 (Alaska 1977); *Gray v. State*, 487 P.2d 680, 681 (Alaska 1971).

In 1975 Justice Erwin noted in his review of criminal sentencing appeals that:

> The court has generally acknowledged that the seriousness of criminal homicide permits the trial judge to exercise rather free rein in fashioning a sentence which places heavy emphasis on societal condemnation of the conduct, and the need to protect society. Thus, the fact that the majority of the defendants involved in homicide cases lack previous criminal records did not affect the results, and the nature of the crimes predominated over almost all other considerations.

Erwin, *Five Years of Sentence Review In Alaska*, 5 UCLA–Alaska L.Rev. 1, 5 (1975).